May it please the Court, my name is Theodore Cox, appearing on behalf of Ms. Zhu. It's hard to describe the BIA's decision other than perfunctory or desultory. In just maybe two short paragraphs addressing a plethora of material about the coerciveness of China's coercive population control policy, this is the label given by Congress to this policy subsequent to her 2004 immigration court hearing where she had an absentia order. I would just also preliminarily point out that I did reference in the brief a related case from the circuit, Li Li Chen, that has subsequently been resolved in favor of Ms. Chen. And I would point that out also because in that case it was a comparison of country conditions in 2004, as here, with subsequent increased enforcement of the one-child policy. The evidence that we have is a series of campaigns, family planning campaigns in Ms. Zhu's home county of Changle. Changle is a city and a county in Fujian province. Almost all of the cases I've litigated have been in Fujian province. They have marshal campaigns, 100-day campaign, 100-day battle, cleanup family planning, cleanup campaign. These are instructions in the record from the family planning authorities to local enforcers. There are local family planning and enforcement personnel in every town all over China. And these are directives, internal directives, to those people to use any means available, any means necessary to ensure that the targets in the target management system, targets in fact are women who have violated the policy, that they are brought to bear with remedial measures, which is a euphemism for forced abortion and with forced sterilization. In reading the judges, the immigration judges order, didn't he consider, let me rephrase that, it appears to me that he did consider the situation prior to 2004 and then made that comparison to the situation in the current situation with the documents that you submitted versus not making a comparison at all. And it appears that his order did indicate that there were those coercive measures in place prior to 2004. Well, there were, I believe the motion was filed to the board and that the board... The BIA decision. The BIA decision. Correct. There was a prior motion to the immigration judge, which is not on review now. There were two prior motions also on this issue of family coercive population control policy. However, the State Department in its 2004 report, which was the relevant report relating to the time of the prior order, says that there are perhaps instances, there might be one-offs or some isolated examples where there might have been a coercive procedure. But as a whole, based on the investigation even by consular officials going to Fujian and making their investigation report, the report adopts their view and the view of the information from family planning officials that it's very rare or almost never happens. So that there has to be a comparison of, in general, what is the general situation in the enforcement of the family planning policy, even though there might have been an occasion on a one-off basis or anecdotal basis of coercion earlier. And what we have in the record, and I think powerfully including the U.S. government's own information from the CECC, that's the Congressional Executive Commission on China, set up in part to review the human rights situation relating to the family planning policy. And it still exists and still makes annual reports that forced abortion and forced sterilization, and this is later on in 2010, 11, 12, is routine, frequent, and the normal application of the policy to individuals in Fujian province. And this is all, we have focused our evidence in the province where Ms. Zhu is from. And the province-wide evidence is that she, with two daughters, is subject to mandatory sterilization, even though they're born in the United States. And there's even a report of a cleanup campaign in Fujian, which is targeting specifically those individuals who have two daughters, because the government rightly, I guess, presumes that Chinese couples would like to have a son to carry the family name. This family, Ms. Zhu, does now have a son. And so I think that if you compare the 2007 report from the State Department, which says there's no sterilizations in the past 10 years and isolated cases only, that comparing that to the active campaigns, militaristics and style, that there is strong evidence of a change of country conditions, which is the basis of this motion. And so I'll reserve the rest of my time if there are no other questions. Very well. May it please the Court. Nicholas Harling for the Respondent. In this case, the Board acted within its discretion to deny the motion to reopen. When Ms. Zhu failed to demonstrate a material change in China's family planning policy between her scheduled 2004 hearing and her 2015 motion to reopen. In this case, the record is voluminous. And one thing that is really important is the dates, because to establish changed circumstances, we have to look at what documents are establishing the baseline before 2004 and around 2004, and then what documents are demonstrating the prevailing situation at the time that Ms. Zhu filed her third motion to reopen in 2015. In looking at these documents, the Board concluded that two aspects of China's family planning policy had remained consistent. The first being that the implementation of the family planning policy varied greatly by locality, and also that the violators faced similar enforcement tactics. As noted in the government's brief, when the Board analyzed the implementation of the policy, it cited the 1995 country reports and the 2004 diplomatic cable. These documents referenced that implementation varied from place to place and that there was a lack of uniformity as well. And then the Board jumped forward to 2012 and 2013 country reports, which referenced enforcement varying significantly, and the 2012 UNHCR report, which specifically referenced Fujian, and said, quote, highly arbitrary and extremely uneven policy implementation. So on the issue of implementation, the Board acted within its discretion to establish a baseline in 2004 and before, and then also look at documents that were roughly within two or three years of the 2015 motion to reopen. And then did find that the coercion or remedial measures were in place prior to 2004. Is that correct? Correct, because that's what I'm moving on next, the tactics, what was used to enforce the policy. What I think you're referencing is the 1995 country reports, which references, quote, physical force to compel abortions, and, quote, required sterilization. Counsel, that citation by the BIA that it's assertion that remedial measures, which is a euphemism for forced abortions, were used at the time of Zhu's original hearing, that rests on the citation to the State Department report at tab U, I guess, triple U. But that term does not even appear in that report. It appears for the first time in the 2005 report, doesn't it? That was 11 months after Zhu's scheduled hearing? I'm not sure, Your Honor, about triple U, but I do know that at triple S, the 1995 country reports is referencing explicitly, quote, required sterilization. I'm sorry. Look at page two of the BIA's opinion. The BIA says it was also reported that remedial measures, in quotes, were also taken in Fujian province to induce some individuals to undergo abortions in the name of compliance with the family planning policy, see motion tab U, U, U. Motion tab U, U, U is the 2004 country report, right? Yes. In fact, the term remedial measures, in quotes, was not used in that report. It didn't appear until the 2005 report. I'm not aware of that. I'm not going to dispute. Well, you should be aware of that. That's kind of critical to the BIA's reasoning in this case, isn't it? But I think what the board is doing is, when it established the baseline, it's going back to 1995. We know that that is referencing required sterilization. So we know in 1995 they're requiring sterilization. Is there any evidence in the record that in 2004 they've changed and that they're no longer requiring sterilization? I think that would be the bigger issue with finding error with the board's decision. That's not the question. The question really is, did the BIA correctly assess what the country conditions were in 2004 when she would have had her hearing and then compare that accurate reflection qualitatively to what were the country conditions at the time of her motion to reopen? I think we have Seventh Circuit and Third Circuit cases that have looked at these exact same documents in the exact same time period and said the BIA is just not accurately depicting that. Well, Your Honor, in the Third and the Seventh Circuit cases, there was a lot more going on. The courts found many more errors than just perhaps one. I think there's more. There's more in here, too. I could point them out, but I won't take your time. Moving on in addressing the board's determination that the tactics used had been consistent, in 1995 they found those referenced to required sterilization and forced abortion. A 2004 diplomatic cable also referenced involuntary abortions. And specifically in Fujian, there was reference to social pressure and fines, as well as unspecified remedial measures. The board then jumped ahead and looked at documents more closely to the 2015 motion to reopen, specifically the CECC reports, which referenced mandatory abortions, remedial measures, the 2012 and 2013 country reports, which referenced sterilization, and the 2012 Refugee Board of Canada, which was specifically referencing Fujian, which talked about forced abortion and sterilization. So for these reasons, it's the government's position that the board took the documents that were presented, established a baseline, and then compared it to the conditions around the time of the 2015 motion to reopen. Were there any further questions from the panel? I don't think so. Thank you so much. Thank you. For the foregoing reasons, the government would request that this Court deny the petition for review. Thank you. Just briefly, Your Honor. So the fact that there is some continuity, that there existed a policy before and after, does not detract from whether or not there was an increased enforcement or enhanced enforcement. So social pressure and fines, no one is arguing that that didn't exist both before and after the 2004, but rather the key is the campaigns and the enhanced enforcement, as indicated especially in the CECC reports and the campaigns documents that we have. And again, I stress that the State Department report in 2004, any immigration judge reading that would say there is not a coercive policy in Fujian at that time. But didn't the board look at the 1995 order as well or the report, the 1995 report, in conjunction with the 2004 report to determine that, yes, those practices were ongoing, and then made that comparison to the 2014? Well, I would just ask the Court to consider that the board has said that all of those reports, as expressed in the JWS, the trio of family planning decisions, JHS, SYG, says it's all not coercive, that there is, you know, there might be some instances, but as a whole, they say that you, based on the evidence, I would say pre-'97, basically, that it is a noncoercive policy in terms of the word, where the word coercion means in asylum law. But this particular judge in this particular case did find that they were coercive measures ongoing. He even used the words remedial measures at some point, but did find that those measures were ongoing before 2004, didn't he? Well, right, but they're isolated, but in isolated examples. The 2004 says it's uses the word isolated cases. So they could have been isolated cases, but an isolated case doesn't make a well-founded fear of persecution. It has to be the general enforcement of the policy in Fujian Province. So I would argue that comparing isolated cases to a generally coercive policy does show a change of country conditions. If there's nothing further, I thank the Court. Thank you very much, Counsel. Thank you both for your argument in this case. This matter is submitted, and we'll move on to the final case for today, United States v. Smith.
judges: Wardlaw, Owens, Marquez